# ATTACHMENT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

_____

| | |
|---|---|
| SATISH JHA, | ) |
| | ) |
| Plaintiff, | )    CIVIL ACTION NO. 14-cv-12269 |
| | ) |
| v. | ) |
| | ) |
| ONE LAPTOP PER CHILD, | ) |
| ASSOCIATION, INC., ONE | ) |
| LAPTOP PER CHILD | ) |
| FOUNDATION, | ) |
| RODRIGO ARBOLEDA, and | ) |
| NICHOLAS NEGROPONTE) | ) |
| | ) |
| Defendants | ) |

_____)

## PLAINTIFF'S SECOND AMENDED COMPLAINT

### I.    INTRODUCTION

1.      Defendants One Laptop Per Child Association, Inc. and One Laptop Per Child Foundation[1] ("OLPC") hired Plaintiff Satish Jha to spearhead their charitable education project in India.

2.      Specifically OLPC hired Satish Jha to connect with influential legislators and other high-powered persons who would open up India for them. Satish did this and more, yet from the start OLPC was poorly planned and managed and was unable to satisfy even the most basic functions required to make a sale in India. This included the specific tasks they listed in the contract that they would carry out.

3.      OLPC stands for "one lap top per child". The goal of the endeavor was to put an OLPC laptop in the hands of every school child in a particular country.

_____

[1] Defendants One Laptop Per Child Association, Inc.("OLPCA") and One Laptop Per Child Foundation ("OLPCF") are jointly referred to herein as "OLPC".

4.	Nicholas Negroponte was the founder of OLPC, Inc. and moved from OLPC, Inc. to the OLPC Foundation in 2008.

5.	Each year prior to 2008, OLPC, Inc. was dependent on OLPC Foundation because it did not generate enough income to be self sustaining

6.	In 2008, OPLC, Inc. was dependent on the OLPC Foundation because it did not generate enough income to be self-sustaining.

7.	In 2009, OPLC, Inc. was dependent on the OLPC Foundation because it did not generate enough income to be self-sustaining.

8.	In 2010, OPLC, Inc. was dependent on the OLPC Foundation because it did not generate enough income to be self-sustaining.

9.	In 2011, OPLC, Inc. was dependent on the OLPC Foundation because it did not generate enough income to be self-sustaining.

10.	In 2012, OPLC, Inc. was dependent on the OLPC Foundation because it did not generate enough income to be self-sustaining.

11.	At all times between 2008 and 2012, Nicholas Negroponte effectively controlled OLPC, Inc. even exercizing veto power over OLPC, Inc. major decisions including hiring and firing of key personnel, funding of projects, and sales decisions at the Executive Level.

12.	OLPC, Inc. operated without a President or Chief Executive Officer prior to the appointment of Rodrigo Arboleda.

13.	This was because Nicholas Negroponte fired the Arboleda's predecessor. During this time OLPC, Inc. was operating in chaos.

14.     In exchange for the promised pay, Satish Jha ("Mr. Jha") performed the specific work that he promised to perform – and more.  He was also promised a commission based on sales performance. The commission was to exceed one dollar per laptop.

15.     OLPC promised to pay Mr. Jha according to the terms of his contract for the work he carried out on behalf of OLPC regularly from 2008 through 2012.

16.     Nicholas Negroponte, the founder of OLPCA and a former officer in both OLPCF and OLPCA, committed to insure that Satish Jha would not be out of pocket a dime and recommitted each year from 2008 through 2012.

17.     After Jha's written contract expired, OLPC, Negroponte and Rodrigo Arboleda, the chief executive officer of OLPC, requested Satish Jha to continue his efforts in being OLPC's India representative.

18.     After Jha's written contract expired, OLPC, Negroponte and Arboleda monitored his activities, instructed him to travel to meetings with OLPC executive level personnel, and regularly communicated with him.

19.     OLPC terminated Jha on July 31, 2012.  They did so in writing.

20.     OLPC did not notify Jha prior to July 31, 2012 that his position with OLPC was terminated.

21.     OLPC did not notify Jha in writing prior to July 31, 2012 that he was to stop working on behalf of OLPC in India as their chief representative.

22.     In fact, Jha continually performed the tasks designated in his Employment Contract and the same role from the date he started in 2008 until the date he was terminated via a writing dated July, 31, 2012.

23.     OLPC did not notify Jha in writing prior to July 31, 2012 that the compensation terms in his Employment Contract was terminated, rather than suspended.

24.     There is no writing from OLPC to Satish Jha notifying him that the terms of his employment contract were no longer being honored prior to July 31, 2012.

25.     OLPC did not notify Jha prior to July 31, 2012 that his entitlement to compensation for his work with OLPC was terminated.

26.     Prior to the July 31, 2012 termination notice, OLPC did not communicate to Jha in writing any changes to the terms of his written contract.

27.     OLPC failed to pay all the wages that it promised to Mr. Jha under the contract.

28.     Mr. Jha thus brings suit for breach of contract, fraudulent inducement, intentional interference with contractual relations, slander, defamation and quantum meruit.

## II.     PARTIES

29.     Plaintiff Satish Jha ("Plaintiff") is an individual residing in 31 Pinewood Road Wellesley, Massachusetts 02182.

30.     Defendant One Lap Per Child Association ("OLPCA") is a for-profit organization organized under the laws of Delaware. OLPCA also has a principal place of business located at 848 Brickell Avenue, Suite 1130, Miami, Florida 33131.  In Florida, OLPCA may be served through its registered agent, CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

31.     Defendant One Lap Per Child Foundation ("OLPCF") is a non-profit organization organized under the laws of Delaware.  OLPCF also has a principal place of business located at 848 Brickell Avenue, Suite 1130, Miami, Florida 33131.  In Florida, OLPCF may be served

through its registered agent, CT Corporation System, 1200 South Pine Island Road, Plantation,

Florida 33324.

32.     Defendant Rodrigo Arboleda resides at 611 N. Mashta Drive, Key Biscayne,

Florida 33149.  Defendant Arboleda acted as the chief executive officer "(CEO") of OLPC.

33.     Defendant Nicholas Negroponte has a last known place of abode at 5 Willard

Street, Cambridge, Massachusetts.

34.     Defendant Negroponte is the founder of OLPCA and served as an officer in both

OLPCF and OLPCA. He is also Chairman Emeritus of Massachusetts Institute of Technology's

Media Lab.

### III.     SUBJECT MATTER JURISDICTION AND VENUE

35.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C.

§ 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs, and is between citizens of different States.

36.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28

U.S.C. § 1391(b), (c) and (d), because Defendants transacted business and a substantial portion

of the alleged activity affected interstate trade and commerce in this District.

37.     Defendants' conduct was within the flow of, was intended to, and did, in fact,

have a substantial effect on the interstate commerce of the United States, including in this

District.

38.     The conduct was directed at, and had the intended effect of, causing injury to a

person residing in, located in, or doing business in this District.

39.     The conduct was directed at, and had the intended effect of causing injury to, a

person residing, located, or doing business in this District.

40.     Venue is thus proper in the District of Massachusetts because a substantial portion of the events forming the basis of this suit occurred in Massachusetts.

41.     The Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under the laws of the several states.

## IV.     FACTS

42.     On July 15, 2008, Prof. Nicholas Negroponte invited Plaintiff to team up with OLPC for its proposed project in India.[2]

43.     The services of Plaintiff were retained by OLPC via Contract No. OLPC – 2008/0801/JHA, which was executed on behalf of OLPC by Mr. Charles Kane, President, on July 29, 2008.

44.     Under the contract, Plaintiff was required to visit India and to identify and connect with high-level government/education officials in India for the promotion of OPLC's activities and products.

45.     Satish Jha traveled to Lucknow, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

46.     Satish Jha traveled to Patna, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

47.     Satish Jha traveled to Kolkata, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

48.     Satish Jha traveled to Jaipur, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

---

[2] Nicholas Negroponte is the founder and Chairman Emeritus of Massachusetts Institute of Technology's Media Lab, and also founded OLPCA. http://en.wikipedia.org/wiki/Nicholas_Negroponte.

49.     Satish Jha traveled to Ahmedabad, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

50.     Satish Jha traveled to Mumbai, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

51.     Satish Jha traveled to Bangalore, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

52.     Satish Jha traveled to Bhopal, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

53.     Satish Jha traveled to Bhubaneshwar, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

54.     Satish Jha traveled to Chennai, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

55.     Satish Jha traveled to Hyderabad, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

56.     Satish Jha traveled to Trivandrum in furtherance of OLPC business with Rodrigo Arboleda's approval.

57.     Satish Jha traveled to Gangtok, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

58.     Satish Jha traveled to Chandigarh, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

59.     Satish Jha traveled to Raipur, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

60.     Satish Jha traveled to Dehradun, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

61.     Satish Jha traveled to Srinagar, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

62.     Satish Jha traveled to Imphal, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

63.     Satish Jha traveled to Guwahati, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

64.     Satish Jha traveled to Tripura, India in furtherance of OLPC business with Rodrigo Arboleda's approval.

65.     Satish Jha also took up residency in New Delhi because that was the capital of India and where the with influential legislators and other high-powered persons who would open up the Government of India, this India, for OLPC carried out the vast majority of tasks.relatimng to the Government of India and India wide programs. It was also where local or state legislators and high-powered persons went for networking and other responsibilities that were related to having OLPC break through the India barrier.

66.     Satish Jha traveled to Mauritius in furtherance of OLPC business with the approval of Charles Kane, Nicholas Negroponte or Rodrigo Arboleda as was his responsibility under the contract.

67.     Satish Jha traveled to Vietnam in furtherance of OLPC business with the approval of Charles Kane, Nicholas Negroponte or Rodrigo Arboleda as was his responsibility under the contract.

68.     Satish Jha traveled to Australia in furtherance of OLPC business with approval  as

was his responsibility under the contract.

69.     Satish Jha traveled to Bangkok in furtherance of OLPC business with the approval as was his responsibility under the contract.

70.     Satish Jha traveled to Hong Kong in furtherance of OLPC business with advanced approval as was his responsibility under the contract.

71.     Satish Jha traveled to Singapore in furtherance of OLPC business with advanced approval as was his responsibility under the contract.

72.     Satish Jha traveled to Islamabad in furtherance of OLPC business with advanced approval as was his responsibility under the contract.

73.     Satish Jha traveled to France in furtherance of OLPC business with advanced approval as was his responsibility under the contract.

74.     Satish Jha traveled to Ethiopia in furtherance of OLPC business with advanced approval as was his responsibility under the contract.

75.     Satish Jha traveled to Ghana in furtherance of OLPC business with advanced approval as was his responsibility under the contract.

76.     Satish Jha traveled to other countries in furtherance of OLPC business with advanced approval as was his responsibility under the contract.

77.     Pursuant to the contract, Plaintiff was to be paid $10,834.00 (USD) per month for his services.

78.     Pursuant to the contract, Plaintiff was to be reimbursed the travel and business expenses incurred by him.

79.     After the authorized signatories of the parties executed the contract, a news release was published globally by OLPC announcing Plaintiff's nomination as President and

CEO, OLPC India.

80.     Thereafter, with Defendants' knowledge, consent and approval, Plaintiff made repeated visits to India for the purpose of identifying and connecting with high-level government/education officials in India and to otherwise promote and gain a toehold in India for OPLC's activities and products.

81.     In consultation with Negroponte and Mr. Kane, Plaintiff set up OLPC India.

82.     In consultation with Defendants Arboleda, Negroponte, and others in positions of authority at OLPC, Plaintiff carried out the terms of his employment.  For example, with Defendants' knowledge, consent and approval, Plaintiff hired staff at various locations in India to assist him, some of whom were paid directly by OLPC.  Other staff members were assigned to Plaintiff by Defendants to assist him in the usual and ordinary course of his OLPC employment.

83.     Satish Jha paid over $100,000 several volunteers who could not have supported OLPC without payment despite goodwill for lack of resources, including, but not limited to, Juhi Sahay, Sujay Narayan, Dr. S N Chaturvedi, Shashawat, Satyakam Goswami, Divyendu Shekhar, Smita, Narendra Sisodiya, school teacher Surve, school teacher Gyani and several other volunteers, to further OPLC efforts in India with the approval of Charles Kane and Rodrigo Arboleda during 2008-2012.

84.     When the original term of the contract between Plaintiff and OLPC expired on December 31, 2008, Plaintiff was asked by OLPC to continue on.

85.     After December 31, 2008, OLPC continued to compensate Plaintiff with the monthly fee of $10,834.00 (USD), as well as to reimburse his expenses as per invoices submitted by Plaintiff.

86.     OLPC did not notify Plaintiff in writing that he was terminated in 2009, 2010, or

10

2011.

87.     OLPC did not notify Plaintiff in writing that his contract terms were modified in 2009, 2010, or 2011.

88.     OLPC did not notify Plaintiff in writing that the extension to his contract was terminated in 2009, 2010, or 2011.

89.     OLPC regularly communicated with Plaintiff about his PLPCA related activities in India in writing during 2009, 2010, or 2011.

90.     Thus, even though the term of the written contract had expired, the relationship continued uninterrupted and as before.

91.     Defendant never advised Plaintiff that he was terminated until July 2012.  The notification was accomplished by an email that included a letter and a web posting on the OLPC website.

92.     Plaintiff agreed to OLPC's offer and continued to render services, which OLPC continued to accept.  Through the date of his termination by Rodrigo Arboleda the plaintiff was continually assured he would be paid his salary and expenses.

93.     In reliance upon those commitments, Plaintiff Satish Jha continued to carry out tasks designed and intended to promote OPLC's activities and products in India.

94.     By mutual agreement of the parties, Plaintiff's contract was extended until Defendant Rodrigo Arboleda terminated him on July 31, 2012.  *See* Attachment A.

95.     After December 31, 2008, OLPC continued to compensate Plaintiff the agreed-upon monthly fee of $10,834.00 (USD), as well as to reimburse his expenses as per invoices submitted by Plaintiff.

96.     Thus, even though the term of the written contract had expired, the relationship

continued uninterrupted and as before. They also requested he continue in the role he had in spearheading OLPC's efforts to break into India. Specifically, as Article 1.1 sets out: "the contractor will identify and connect with high-level government /education officials; establish a weekly Leads status report and proposal/bid conversion report; once a lead is identified and qualified to be legitimate, provide an overview of the opportunity to ensure a clean hand-off for sales implementation; and maintain a complete contact database of all public and private sector people and organizations that may lend themselves to current/future OLPC opportunities." In fact, Jha satisfied the terms of the contract by generating many, many solid sales leads up to the potential sale of one million (1,000,000) OLPC laptops. OLPC breached its contract by failing to follow up in any way what-so-ever.  They also breached their contract each time they insisted at Nicholas Negroponte's urging to reject sales of laptops under one million (1,000,000) units.

97.     Under OLPC's instructions and directives, Plaintiff visited practically every state in India. His visits resulted in solid OLPC laptop leads including requests for purchases. Specifically:

    a.  Satish Jha provided leads with the state of The Manipur Order for 70,000 laptops.

    b.  Satish Jha provided leads with the state of Mawana for 25,000 laptops.

    c.  Satish Jha provided leads with the state of Haryana for 30,000 laptops.

    d.  Satish Jha provided leads with the state of Madhya Pradesh for 11,000 laptops.

    e.  Satish Jha provided leads with the state of Bihar for an undetermined number of laptops

    f.  Satish Jha provided leads with the state of Himachal Pradesh for 25,000 laptops.

g.   During each year from 2009-2012 Rodrigo Arboreda's travel expenses exceeded $100,000.

h.   During each year from 2009-2012 Nicholas Negroponte's travel expenses exceeded $100,000.

98.   According to Article 1 of the JHA/OLPC Contract Satish Jha was obligated to identify and connect with high-level government/education officials in India.

99.   Satish Jha identified and connected with high-level government/education officials in India on behalf of OLPC in 2009.

100.   Satish Jha identified and connected with high-level government/education officials in India on behalf of OLPC in 2010.

101.   Satish Jha identified and connected with high-level government/education officials in India on behalf of OLPC in 2011.

102.   Satish Jha identified and connected with high-level government/education officials in India on behalf of OLPC in 2012 prior to the date he was terminated.

103.   At no time during Mr. Jha's employment with OLPC did they have internal forms referred to as "Leads status report" and "proposal/bid conversion report".

104.   At no time during Mr. Jha's employment did OLPC supply him with internal forms referred to as a "Leads status report".

105.   At no time during Mr. Jha's employment did OLPC supply him with internal forms referred to as a "proposal/bid conversion report".

106.   Following the execution of the written JHA/OLPC Contract, at no time during Mr. Jha's employment with OLPC did OLPC insist that he label the reports he made as "Leads status reports".

13

107.    Following the execution of the written JHA/OLPC Contract, at no time during Mr. Jha's employment with OLPC did OLPC insist that he label the reports he made as "proposal/bid conversion reports".

108.    At no time during 2009 did OLPC have in place a proposal/bid conversion process that was sufficient to meet the demands of the leads Mr. Jha brought to OLPC's attention.

109.    At no time during 2010 did OLPC have in place a proposal/bid conversion process that was sufficient to meet the demands of the leads Mr. Jha brought to OLPC's attention.

110.    At no time during 2011 did OLPC have in place a proposal/bid conversion process that was sufficient to meet the demands of the leads Mr. Jha brought to OLPC's attention.

111.    At no time during 2012 did OLPC have in place a proposal/bid conversion process that was sufficient to meet the demands of the leads Mr. Jha brought to OLPC's attention.

112.    During 2009 Mr. Jha maintained a contact database of all public and private sector people and organizations that he contacted that were in a position to offer OLPC potential sales opportunities.

113.    During 2010 Mr. Jha maintained a contact database of all public and private sector people and organizations that he contacted that were in a position to offer OLPC potential sales opportunities.

114.    During 2011 Mr. Jha maintained a contact database of all public and private sector people and organizations that he contacted that were in a position to offer OLPC

potential sales opportunities.

115.    During 2012 Mr. Jha maintained a contact database of all public and private

sector people and organizations that he contacted that were in a position to offer OLPC

potential sales opportunities.

116.    The terms of the contract of JHA/OLPC Contract at 1.2 define his deliverables as

"visits, arrangements, status reports and any documentation requested by OLPC.

117.    During 2009 Mr. Jha satisfied what was required of him by Article 1.2 of the

JHA/OLPC Contract.

118.    During 2010 Mr. Jha satisfied what was required of him by Article 1.2 of the

JHA/OLPC Contract.

119.    During 2011 Mr. Jha satisfied what was required of him by Article 1.2 of the

JHA/OLPC Contract.

120.    During 2012 Mr. Jha satisfied what was required of him by Article 1.2 of the

JHA/OLPC Contract prior to his termination.

121.    The JHA/OLPC Contract was extended by agreement of the parties beyond

December 2008.

122.    OLPC paid Mr. Jha his monthly service and materials fee of $10,834.00 after

December 2008.

123.    OLPC paid Mr. Jha OLPC related expenses he submitted for reimbursement after

December 2008.

124.    According to ARTICLE 6 of the JHA/OLPC Contract "Either OLPC or the

contractor may, at its sole convenience, terminate this contract provided thirty (30) days

written notice is given to the other party in the event of such termination, the Contractor

shall immediately stop work to the extent required, and after delivery to OLPC of all work completed and/or in progress, the Contractor shall be entitled to payment for all services satisfactorily performed prior to the effective termination date as stated in the notice."

125.    OLPC did not provide Satish Jha with written notice that he was terminated and should stop work in 2009.

126.    OLPC did not provide Satish Jha with written notice that he was terminated and should stop work in 2010.

127.    OLPC did not provide Satish Jha with written notice that he was terminated and should stop work in 2011

128.    OLPC did not provide Satish Jha with written notice that he was terminated and should stop work in 2012.

129.    Written notice pursuant to ARTICLE 6 of the JHA/OLPC Contract was not provided to Mr. Jha until July 2012.

130.    According to the terms of the contract of JHA/OLPC Contract "Once a lead is identified and qualified to be legitimate" Satish Jha was obligated to "provide an overview of the opportunity to ensure a clean hand-off for sales implementation.

131.    During 2009 Jha requested that OLPC allow him to hand off potential sales.

132.    During 2010 Jha requested that OLPC allow him to hand off potential sales.

133.    During 2011 Jha requested that OLPC allow him to hand off potential sales.

134.    During 2012 Jha requested that OLPC allow him to hand off potential sales.

135.     In the context of the JHA/OLPC Contract a "legitimate" sales lead was an interested party with funds sufficient to commit to a purchase.

136.     During the years 2008-2009 Nicholas Negroponte, as President of OLPC Foundation did not consider any sale below one million units as acceptable.

137.     During the year 2008 Nicholas Negroponte, as President of OLPC Foundation did not consider any sale below one million units as acceptable.

138.     During the years 2009-2010 Nicholas Negroponte, as President of OLPC Foundation did not consider any sale below one million units as acceptable.

139.     During the years 2010-2011 Nicholas Negroponte, as President of OLPC Foundation did not consider any sale below one million units as acceptable.

140.     During the years 2011-2012 Nicholas Negroponte, as President of OLPC Foundation did not consider any sale below one million units as acceptable.

141.     OLPC, Inc. was entirely dependent on OLPC, Foundation for funding during the years 2009-2012.

142.     OLPC, Inc. was not self-funding and required donations from the OLPC, Foundation to operate during the years 2009-2012.

143.     OLPC lacked the capacity to satisfy its obligations under the terms of the JHA OLPC Contract" during the years 2009-2012.

144.     During the years 2009-2012 OLPC did not have a protocol in place to deal with contract negotiations with India leads.

145.     OLPC did not have a lead Home Office contact in place to deal with contract negotiations with India leads.

146.     OLPC did not have a sufficient Collateral Security program in place to satisfy the requirements of the potential contracts with potential OLPC sales leads that Satish Jha generated in India.

147.    Satish Jha provided OLPC leads with the State of Manipur.

148.    The State of Manipur expressed an interest in purchasing about 70,000 OLPC laptops.

149.    The State of Manipur made requests related to an order of approximately 21.6 Million dollars worth of OLPC laptops on March 26, 2009.

150.    OLPC was unable to meet the State of Manipur's supplier criteria.

151.    After OLPC was unable to meet the State of Manipur's supplier criteria, the State of Manipur order was scaled down to a pilot of 1000 laptops as the first phase.

152.    No one at OLPC contacted the persons with authority to contract in Manipur in furtherance of this lead.

153.    No one at OLPC contacted the Secretary of Education, initially P K Singh followed by Vivek Dewangan, who were the persons with authority to contract in Manipur in furtherance of this lead.

154.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to the State of Manipur.

155.    Satish Jha provided OLPC leads with the State of Kerala.

156.    The State of Kerala expressed an interest in purchasing about 70,000 OLPC laptops.

157.    During 2009 the State of Kerala made requests related to an order of approximately 13.5 Million dollars worth of OLPC laptops.

158.    No one at OLPC contacted the persons with authority to contract in Kerala in furtherance of this lead.

159.    No one at OLPC contacted Anwar Sadat, Director for the Computerization of

School Education, who was the person with authority to contract in Kerala in furtherance of this lead.

160.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to the State of Kerala.

161.    OLPC was unable to agree to support, demonstrate, offer collaterals required by the procurement process and instead of working with the state government that had taken a cabinet decision to support OLPC laptops, OLPC organization could not agree whether to supply 45000 laptops as Nicholas Negroponte wanted the order to be at least for 1 million laptops.

162.    During 2009 Satish Jha provided OLPC leads with the Shriram Group at Mawana.

163.    The Shriram Group at Mawana expressed an interest in purchasing about 25,000 OLPC laptops.

164.    During 2009 the Shriram Group at Mawana made requests related to an order of approximately 25,000 OLPC laptops.

165.    No one at OLPC contacted the persons with authority to contract in Mawana in furtherance of this lead.

166.    No one at OLPC contacted Priya Somaiya, who was the person with authority to contract in Mawana in furtherance of this lead.

167.    OLPC was unable to meet the Mawana criteria of competitive pricing.

168.    OLPC was unable to meet the Mawana criteria of providing a product demonstration to their management.

169.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to the State of Mawana.

170.    Satish Jha provided OLPC leads with the State of Haryana.

171.    The State of Haryana expressed an interest in purchasing about 30,000 OLPC laptops.

172.    During 2009 the State of Haryana made requests related to an order of approximately 30,000 OLPC laptops.

173.    No one at OLPC contacted Vivek Ahuja, Rajeev Arora or Chattar Singh, responsible secretaries to the Government of Haryana, the persons with authority to contract in the State of Haryana in furtherance of this lead.

174.    No one at OLPC contacted the Secretary of Education, who was the person with authority to contract in Harayana in furtherance of this lead.

175.    OLPC was unable to meet the State of Haryana qualifying criteria.

176.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to ethe State of Harayana.

177.    Satish Jha provided OLPC leads with the State of Madhya Pradesh.

178.    The State of Madhya Pradesh expressed an interest in purchasing about 11,000 OLPC laptops.

179.    During 2009-2012 the State of Madhya Pradesh made requests related to an order of approximately 11,000 OLPC laptops.

180.    No one at OLPC contacted the persons with authority to contract in State of Madhya Pradesh in furtherance of this lead.

181.    No one at OLPC contacted Ajit Nair, who was the person with authority to contract in Madhya Pradesh in furtherance of this lead.

182.    OLPC was unable to meet the State of Madhya Pradesh qualifying criteria.

183.    The OLPC Home Office did not assign a person at the Home Office to spearhead

finalizing the potential sale to the State of Madhya Pradesh.

184.    OLPC was unable to go through the process of being qualified as a vendor with any Indian State during the years 2008-2012.

185.    OLPC was unable to go through the process of being qualified as a vendor with the Government of Indian during the years 2008-2012.

186.    OLPC was unable to go through the process of being qualified as a vendor with any Indian local purchasing authority during the years 2008-2012.

187.    Satish Jha provided OLPC leads with the State of Bihar.

188.    The State of Bihar expressed an interest in purchasing OLPC laptops.

189.    During 2010-2012 the State of Bihar made requests related to an order of OLPC laptops.

190.    No one at OLPC contacted the persons with authority to contract in State of Bihar in furtherance of this lead.

191.    No one at OLPC contacted Anjani Kumar, who was the person with authority to contract in Bihar in furtherance of this lead.

192.    OLPC was unable to meet the State of Bihar qualifying criteria.

193.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to the State of Bihar.

194.    OLPC was unable to Agree to support the teacher's training programs in the first phase.

195.    Satish Jha provided OLPC leads with the State of Himachal Pradesh.

196.    The State of Bihar expressed an interest in purchasing OLPC laptops.

197.    During 2009-2011 the State of Himachal Pradesh made requests related to an

order of 25,000 OLPC laptops.

198.    No one at OLPC contacted the persons with authority to contract in State of Himachal Pradesh in furtherance of this lead.

199.    No one at OLPC contacted PC Dhiman, Shrikant Baldi or Arun Sharma, who were the persons with authority to contract in Himachal Pradesh in furtherance of this lead.

200.    OLPC was unable to meet the State of Himachal Pradesh qualifying criteria.

201.    OLPC was unable to send the State of Himachal Pradesh 100 laptops as demonstration units.

202.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to the State of Himachal Pradesh.

203.    Satish Jha provided OLPC with leads for the State of Lakshmi Narayan.

204.     The leads for the State of Lakshmi Narayan included the Chairman of Cognizant Technologies and government officials within the State of Lakshmi Narayan.

205.    The Chairman of Cognizant Technologies and government officials within the State of Lakshmi Narayan expressed an interest in purchasing OLPC laptops.

206.    During 2009 the Chairman of Cognizant Technologies and government officials within the State of Lakshmi Narayan made requests related to an order of $19,999 worth of laptops.

207.    The Chairman of Cognizant Technologies, Lakshmi Narayan, request for $19,999 worth of laptops related to a pilot program.

208.    No one at OLPC contacted the Chairman of Cognizant Technologies and government officials within the State of Lakshmi Narayan in furtherance of this lead.

209.    No one at OLPC contacted the Chairman of Cognizant Technologies or anyone

22

else in that company in furtherance of this lead.

210.    No one at OLPC contacted any government officials within the State of Lakshmi Narayan in furtherance of this lead.

211.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to the State of Lakshmi Narayan or Cognizant Technologies.

212.    OLPC was unable to meet the Cognizant Technologies qualifying criteria.

213.    OLPC was unable to meet the State of Lakshmi Narayan qualifying criteria.

214.    OLPC was unable to run with the lead to supply larger numbers.

215.    On January 8, 2010 Satish Jha provided leads at the Government of Madhya Pradesh and UNICEF to OLPC related to interest in a statewide million child OLPC laptop program.

216.    The Government of Madhya Pradesh and UNICEF expressed an interest in purchasing about one million (1,000,000) OLPC laptops.

217.    During 2009 the Government of Madhya Pradesh and UNICEF made requests related to an order of an estimated one million (1,000,000) OLPC laptops.

218.    No one at OLPC contacted the persons with authority to contract in the Government of Madhya Pradesh in furtherance of this lead.

219.    No one at OLPC contacted Hari Ranjan Rao, who was the person with authority to contract at UNICEF in furtherance of this lead.

220.    No one at OLPC contacted Snehlata Srivastava, who was the person with authority to contract with the Government of Madhya Pradesh in furtherance of this lead.

221.    No one at OLPC contacted Ajit Nair, who was the person with authority to contract at UNICEF in furtherance of this lead.

222.    OLPC was unable to meet the Government of Madhya Pradesh qualifying criteria.

223.    The OLPC Home Office did not assign a person at the Home Office to spearhead finalizing the potential sale to either the Government of Madhya Pradesh or UNICEF.  OLPC was unable to meet the UNICEF qualifying criteria.

224.    With OLPC's knowledge and consent, during his employ Plaintiff introduced OPLC's activities and product in India. Plaintiff's related activities included, but were not limited to, meetings with chief ministers, education ministers, secretaries, other senior government officials and conveners of various state and national government sponsored educational programs.

225.    Plaintiff's work also included, but was not limited to, projects such as Sarva Sikhsha Abhiyan.

226.    Additionally, to create wide awareness of OLPC's operations, programs and benefits in India, Plaintiff arranged for coverage in the media, including appearing on various television channels.

227.    Plaintiff also arranged for OLPC officials from the United States who were visiting India to meet officials holding key posts and positions in India.

228.    Plaintiff also connected OLPC officials to both print and visual media.

229.    OLPC's then-Chairperson Negroponte repeatedly and categorically assured Plaintiff that he would not have to spend anything out of his pocket and that his salary would be fully paid for at least another year.

230.    Before stepping down, Negroponte advised Plaintiff that he would coordinate this with OLPC including its new Chairman of OLPC.

231.    Thereafter, OLPC reassured Plaintiff that he would be compensated at the same

rate he had been receiving and that he would be reimbursed for his expenses as soon as OLPC's finances improved.

232.    In reliance on Negroponte's representations and other binding representations made by OLPC, Plaintiff continued to perform his duties.

233.    Unbeknownst to Plaintiff, Defendant Negroponte engaged in a defamatory campaign against him by making false and untrue statements to OLPC and related individuals.

234.    During 2009 through 2012, Defendant Negroponte falsely informed Defendant Arboleda that Plaintiff was not performing his obligations or producing results for India.

235.    For example, on November 13, 2011, Defendant Negroponte sent an email to Defendant Arboleda about Plaintiff, stating that he is someone "whom none of us fully respect."

236.    Even after his termination, on March 23, 2013, Negroponte further defamed Plaintiff in an email sent to Jeff Smith responding to Mr. Smith's comment that the press had negative things to say about Negroponte by defaming Plaintiff as "really flaky."

237.    Unbeknownst to Plaintiff, Defendant Arboleda engaged in a defamatory campaign against him by making false and untrue statements to OLPC and related individuals.

238.    For example, on November 14, 2011, Defendant Arboleda sent an email to Defendant Negroponte stating about the Plaintiff that he had "egomania" and "if only he could shut his mouth more."

239.    Unbeknownst to Plaintiff, Defendant Hacker engaged in a defamatory campaign against him by making false and untrue statements to OLPC and related individuals.

240.    For example, on June 3, 2010, Defendant Hacker sent an email to Defendant Arboleda stating that Plaintiff "is becoming a real pain and wasting huge amounts of time."

241.    After April 2009, OLPC stopped paying Plaintiff's fee and expenses. The

invoices sent to OLPC by the Plaintiff for the months of May and June 2009 were unpaid.

242.    Nicholas Negroponte advised Rodrigo Arboleda to pay Satish Jha's outstanding expenses during 2009.

243.    Nicholas Negroponte advised Rodrigo Arboleda to pay Satish Jha's outstanding expenses during 2010.

244.    Nicholas Negroponte advised Rodrigo Arboleda to pay Satish Jha's outstanding expenses during 2011.

245.    Nicholas Negroponte advised Rodrigo Arboleda to pay Satish Jha's outstanding expenses during 2012.

246.    Satish Jha requested OLPC to pay his OLPC related monthly fee of $10,834 during 2009.

247.    Satish Jha requested OLPC to pay his OLPC related monthly fee of $10,834 during 2010.

248.    Satish Jha requested OLPC to pay his OLPC related monthly fee of $10,834 during 2011.

249.    Satish Jha requested OLPC to pay his OLPC related monthly fee of $10,834 during 2012.

250.    Satish Jha requested OLPC to pay his OLPC related outstanding expenses during 2009.

251.    Satish Jha requested OLPC to pay his OLPC related outstanding expenses during 2010.

252.    Satish Jha requested OLPC to pay his OLPC related outstanding expenses during 2011.

253.    Satish Jha requested OLPC to pay his OLPC related outstanding expenses during 2012.

254.    Plaintiff was told that OLPC was undergoing financial problems and payments to him would resume in some time.

255.    From April 2009 to July 2011, OLPC reassured Plaintiff that he would be compensated at the same rate he had been receiving. The assurances initially came from Negroponte and later from the CEO of OLPC, Defendant Arboleda.

256.    From May 2009 to July 2011, OLPC reassured Plaintiff that that he would be reimbursed for his expenses as soon as OLPC's finances improved. The assurances initially came from Negroponte and later from Defendant Arboleda.

257.    Defendant Arboleda reassured Plaintiff repeatedly that OLPC would pay him and made statements to encourage him to keep working such as the following:  "I will take care of compensation for you," and "as things happen I will take care of everything."

258.    Defendant Arboleda repeated his promise to make Plaintiff whole when he came to India in 2011.

259.    Of note, when Defendant Arboleda visited India in July 2011, he gave Plaintiff additional employees – Sanjeev Chaudhary and Ajay Nath.

260.    Defendant Arboleda promised he would pay Plaintiff as soon as OLPC's finances improved, and Plaintiff agreed to this, even going so far as to approve the pay of Sanjeev Chaudhary and Ajay Nath before he was made whole.

261.    Based on OLPC's reassurances and at its request, Plaintiff continued working for OLPC.

262.    Plaintiff's perseverance and hard work translated into highly positive responses

from the states of Kerala, Manipur, Uttar Pradesh, Himachal Pradesh, Rajasthan, Gujarat,

Madhya Pradesh, Maharashtra, Karnataka, Bihar and West Bengal.

263.     The work performed by Plaintiff yielded results with the governments of Kerala,

Rajasthan and Manipur placing orders for OLPC laptops.

264.     OLPC continued to receive reports from Plaintiff on a regular basis and

exchanged many collaborative emails and made work requests to Plaintiff.

265.     Upon the additional assurances of Chairman Negroponte, CEO Arboleda and

OLPC, Plaintiff continued to provide dedicated service to OLPC.

266.     Plaintiff was told that OLPC was undergoing financial problems and payments to

him would resume in some time.  With OLPC's knowledge and consent Plaintiff used his own

savings, pension funds and borrowings from friends and family to make the necessary expenses

for travel to and stay in India, for travel within India, and for other expenses, such as phone bills.

267.     Between May 2009 and July 2011, Plaintiff also carried the cost of employees.

Plaintiff did all this with the expectation of being made whole.  At all times relevant herein,

Defendant Arboleda made clear to Plaintiff that he would be made whole.

268.     To reduce OLPC's expenses, Plaintiff even moved OLPC India's office from the

Hotel Ambassador complex in Delhi to a location in Gurgaon, for which no rental had to be paid.

In calling in a personal favor from a friend, Plaintiff again established he was a dedicated

employee willing to go the extra distance for the benefit of his employer.

269.     Plaintiff also procured the assistance of volunteers who worked for OLPC India.

In addition to the OLPC, India workers Satish paid, he recruited other volunteers to work for free.

The expense reimbursements were paid for by Plaintiff who relied on Arboleda's representations

he would be reimbursed and made whole once OLPC, Inc. improved its financial situation. He

also relied on Nicholas Negroponte's representation that he would never be out of pocket a dime. In reliance on their representations he used drained his life savings. As detailed below he also borrowed considerable funds from his then wife, and later, from his current wife. He also borrowed from his family.

270.    OLPC repeated assured Plaintiff that he too would be fully reimbursed and would be compensated his fee when OLPC regained financial stability.

271.    Eventually OLPC started to meet the terms of its promised reimbursement of expenses and outstanding salary due.  In July 2011, OLPC reimbursed Plaintiff's expenses and continued to do so until June 2012.  They then suddenly stopped.

272.    At that time or since, no payment was made towards the outstanding monies due Plaintiff for his services.

273.    Plaintiff is due for services rendered from May 2009 to September 6, 2012.

274.    In addition, other expense reimbursements remain unpaid.

275.    Satish Jha borrowed over $200,000 from his current wife Mona Chopra during 2008 to 2012.

276.    Satish Jha incurred a debt with his ex wife of an amount over $250,000 during 2008 to 2012.

277.    All this while, and up to September 6, 2012, Plaintiff continued to work for OLPC, determined to make OLPC India a successful venture, believing the repeated reassurances from OLPC that all he was due would be paid and he would be made whole.

278.    Plaintiff, having put his heart and soul in the project and even his personal funds and resources (with the understanding that same would be made good by OLPC), was extremely disappointed when eventually; Plaintiff's advice was ignored by OLPC and Defendant

Negroponte, preventing OLPC India from reaching its potential.

279.    For example:

    a.   the Indian state of Kerala wanted to start with one laptop per 4 children but OLPC refused this request;

    b.   Manipur ordered $21 million dollars in computers and OLPC wanted a 20 percent advance payment. The government does not advance monies without bank guarantees; and

    c.   Rajasthan wanted to order $14 million of computers and the governor of the state put it in their budget. OLPC could not demonstrate that the state curriculum could be ported on the laptop.

280.    Defendant advised Plaintiff that he was terminated on September 6, 2012.  This was accomplished by an email that included a letter and a web posting on the OLPC website.

281.    In an e-mail communication sent to Plaintiff on September 19, 2012, Defendant Arboleda wrote the following:

> I met with Nicholas here in Boston. He shared with me your correspondence with him.  He asked me to manage this issue with the objective of finding a fair resolution to both parties to which I agreed, as has always been my attitude.
>
> Since this will involve executing of documents that will be mutually binding, I am cc not only Nicholas in this mail (not to be cc from now as per his own request) and Richard Bernstein, our BOD member and chief legal counsel.
>
> Please respond to this e mail so we can start the process ASAP.

282.    Defendant Arboleda's e-mail was soon followed by an e-mail also dated September 19, 2012, from Mr. Richard Bernstein to Plaintiff that stated:

> In furtherance of Rodrigo and Nicholas's shared objective of reaching a

fair and equitable resolution, I would appreciate the opportunity to speak with you and discuss ideas.

Unfortunately, I am tied up the rest of today but can be available tomorrow morning any time from 8 am to 11:45 am. What time could work for you?

In the interim, until an agreement is reached, it would be very helpful for all parties not to make any public comments, blog posts or statements.  In these kinds of situations, such statements often make a resolution more difficult.

I ask that you, and Rodrigo, manage this and maintain the professional privacy/confidentiality which will be constructive to reaching closure and an appropriate communication plan.

Please advise on a time tomorrow we can speak.

283.    Unfortunately, in spite of the assurance via the e-mails of September 19, 2012, and Plaintiff's repeated efforts to meet with Defendant Arboleda and Mr. Bernstein, no positive action was taken by OLPC to resolve the issue.

284.    E-mails sent by Plaintiff to OLPC with detailed accounts remained unanswered.

285.    OLPC currently owes Plaintiff an amount that exceeds $733,000.00.

## V.    FRAUDULENT CONCEALMENT

286.    Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of his injuries at an earlier time.  Plaintiff did not suspect, nor did he have reason to suspect, the tortious nature of the conduct causing the injuries, until after filing this action and obtaining discovery.  Defendants were in sole possession and control of evidence including emails on which Plaintiff was not copied on and conversations to which Plaintiff was not a party.

## VI. CAUSES OF ACTION

### COUNT ONE: Breach of Contract

287.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set

forth herein.

288.    Plaintiff and Defendants entered into a written contract dated July 29, 2008, whereby Plaintiff agreed to furnish various services to Defendants and Defendants agreed to pay for said services.  Plaintiff has fully performed the contract and Plaintiff has fully provided services to Defendants pursuant to said contract.  Defendants accepted such services and became bound to pay Plaintiff the total amounts it promised.  Plaintiff has performed all precedents to filing suit, as a result of the breach by Defendants.  Plaintiff has suffered damages as described above.

289.    Although the original written contract between OLPC and Plaintiff expired on December 31, 2008, OLPC extended the contract with Plaintiff by continuing to request the same volume and type of work and by continuing to pay, for a time, the same wages as specified under the written agreement. They also reaffirmed the contract regularly by paying Mr. Jha, unequivocally promising him they would make him whole and provide him with commissions of over a dollar a laptop once a sale was made and by monitoring his activities and by exerting oversight and control and by providing him with (insufficient) assistance and by visiting him and instructing him to visit and report to them.

290.    Eventually, however, OLPC stopped paying Plaintiff but encouraged him to work with promises that his wages of $10,834.00 per month plus expenses and commission would be paid.  OLPC's failure to pay Plaintiff his promised wages from May 2009 onward is therefore a breach of OLPC's contract with Plaintiff.

291.    As described elsewhere, OLPC breached its contract by failing to live up to their end of the bargain.

Wherefore Plaintiff demands damages including interest from the date of the breach,

which in this case is the date the contract was signed, in an amount deemed just and fair.

## COUNT TWO: Quantum Meruit

292.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

293.    Alternatively, Plaintiff seeks recovery from Defendants in the amount of at least $733,420.00 on the theory of quantum meruit.  Plaintiff furnished valuable services and goods to Defendants, which benefited Defendants.  Plaintiff expected to be compensated.  A reasonable value for the Plaintiff's services is at least $733,420.00 plus additional costs and expenses.

Wherefore Plaintiff demands damages including interest in an amount deemed just and fair.

## COUNT THREE: Fraud and Fraudulent Inducement

294.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

295.    By promising repeatedly to satisfy the payment of Plaintiff's outstanding salary, Defendants induced Plaintiff to continue working without payment.

296.    However, Defendants promised future payment to Plaintiff without the intention of ever making the payment.

297.    Defendants promised future payment to Plaintiff with the knowledge that these promises would induce Plaintiff to continue working for Defendants.

298.    Plaintiff reasonably relied upon Defendants' promises to pay his belated salary in continuing to work for Defendants.

299.     Plaintiff's reliance upon Defendants' promises to make payment caused Plaintiff to incur damages in the amount of the promised salary.

Wherefore Plaintiff demands damages including interest in an amount deemed just and fair.

### COUNT FOUR: Intentional Interference with Contractual Relations
#### (Against Nicholas Negroponte)

300.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

301.    Plaintiff entered into an employment contract and relationship with OLPC. Pursuant to that contract, Defendant OLPC is obligated to pay in full Plaintiff's salary and costs related to his employment.

302.    Defendant Negroponte had knowledge of Plaintiff's business relationship with Plaintiff.

303.    Defendant Negroponte has knowingly, willfully and purposely induced OLPC to materially breach their contract with Plaintiff through improper means and with an improper motive.

304.    In addition, Defendant Negroponte has knowingly, willfully and purposely engaged in acts that inhibited Plaintiff's performance of certain actions to further the contract and/or caused the performance of the contract by Plaintiff to be more expensive and burdensome. Although he had no legal relationship or authority, Negroponte used his power over OLPC, Inc. and Arboleda most generally to veto any sale under a million laptops. More specifically – Negroponte used is power to veto or block Jha's potential sales.

305.    As a direct and proximate cause of Defendant Negroponte's tortious interference with Plaintiff's contracts, Plaintiff has suffered direct and consequential damages in an amount to be determined at trial.

306.    In addition, Defendant Negroponte acted with malice, oppression and fraud and

with intentional and conscious disregard of Plaintiff's rights, deliberately induced OPLC to

material breach their contract and deprived Plaintiff of his rightful proceeds from that contract.

Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant Negroponte

in an amount to be determined at trial.

Wherefore Plaintiff demands damages including interest in an amount deemed just and

fair.

## COUNT FIVE: Defamation and Slander
### (Against Nicholas Negroponte)

307.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set

forth herein.

308.    The statements and communications of Defendant Nicholas Negroponte to

Arboleda regarding Plaintiff's deficient performance were false and untrue and defamed Plaintiff.

309.    The conduct of Defendant Negroponte as described constitutes defamation and/or

slander and libel, negligently or intentionally, as defined in the common law for the

Commonwealth of Massachusetts.

310.    Defendant Negroponte made and/or published the false and defamatory

statements with the knowledge that the statements were false, or with reckless disregard as to the

falsity of the statements.

311.    The conduct as alleged in this Count, directly and proximately caused Plaintiff to

suffer related loss, including the loss of his employment and emotional distress, and injured his

business reputation.

## JURY DEMAND

Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

Wherefore, premises considered, Plaintiff respectfully requests that Defendants be cited to appear and answer, and on final trial Plaintiff have the following relief:

a.  Judgment against Defendants for damages in an amount within the jurisdictional limits of the Court;

b.  Pre-judgment and post-judgment interest from the date of the breach or as otherwise provided by law;

c.  Punitive damages against Defendant Negroponte;

d.  Attorney's fees;

e.  Costs of suit; and

f.  Any other such relief to which Plaintiff may be justly entitled.

Respectfully submitted,

PLAINTIFF SATISH JHA
By his Attorney,

/s/ Robert J. Bonsignore
Robert J. Bonsignore, BBO #547880
Bonsignore Trial Lawyers, PLLC
3771 Meadowcrest Drive
Las Vegas, NV 89121
Telephone: (781) 350-0000
Cell: (781) 856-7650
E-mail:  rbonsignore@classactions.us

Dated:  February 26, 2016